IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CRIMINAL ACTION NO. 3:23-CR-00205-KDB-DCK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | **ORDER** |
| AARON CARMICHAEL, | |
| Defendant. | |

**THIS MATTER** is before the Court on Defendant Aaron Carmichael's Motion to Suppress (Doc. No. 13). The Court has carefully considered this motion, the parties' briefs and exhibits, and testimony and oral argument on the motion from the suppression hearing held on June 25, 2024. For the reasons discussed below, the Court will **DENY** the motion.

## I.      LEGAL STANDARD

The Fourth Amendment ensures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. However, rather than "proscrib[ing] all contact between the police and citizens," *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984), the Fourth Amendment "prevent[s] arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," *id.* (quoting *United States v. Martinez-Fuente*, 428 U.S. 543, 554 (1976)). The ultimate touchstone of the Court's analysis is whether a search is "reasonable under the circumstances." *United States v. Palmer*, 820 F.3d 640, 648 (4th Cir. 2016) (citing *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment and [therefore] must be reasonable under the circumstances." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 653-

1

54 (1979)). The seizure begins when the vehicle is stopped by police and ends when the police

"have no further need to control the scene, and inform the driver and passengers they are free to

leave." *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014) (quoting *Arizona v. Johnson*,

555 U.S. 323, 333 (2009)).

To review the constitutionality of a traffic stop, courts use the two-prong standard from

*Terry v. Ohio*, 392 U.S. 1 (1968). First, the Court must determine whether it was lawful for police

to "detain [the] automobile and its occupants pending inquiry into a vehicular violation." *Palmer*,

820 F.3d at 649 (quoting *Johnson*, 555 U.S. at 327). "Without question," failure to comply with

traffic laws provides sufficient justification to stop a vehicle. *Id.* (citing *Green*, 740 F.3d at 279 n.1

(noting "the illegally tinted windows alone were sufficient to justify the stop.")). Second, the Court

assesses whether the stop is "sufficiently limited in scope and duration to satisfy the conditions of

an investigative seizure." *Palmer*, 820 F.3d at 649 (quoting *United States v. Guijon-Ortiz*, 660 F.3d

757, 764 (4th Cir. 2011)). Specifically, the police must use the "least intrusive means reasonably

available," but not the "least intrusive means conceivable," to "verify or dispel his suspicion in a

short period of time." *Id.* (citations omitted). Importantly, an officer may not "investigate 'a matter

outside the scope of the initial stop' unless he receives the motorist's consent or develops

reasonable, articulable suspicion of ongoing criminal activity." *Id.* at 649-50 (quoting *United

States v. Digiovanni*, 650 F.3d 498, 507 (4th Cir. 2011)).

Reasonable suspicion, "a less demanding standard than probable cause," requires officers

to have "at least a minimal level of objective justification for making the stop." *United States v.

Critchfield*, 81 F.4th 390, 393 (4th Cir. 2023) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123

(2000)). In short, it must be "something more than an 'inchoate and unparticularized suspicion or

'hunch.'" *United States v. Burton*, 228 F.3d 524, 527 (4th Cir. 2000) (quoting *Terry*, 392 U.S. at

27). In the case of a traffic stop, the police officer must be able "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Williams*, 808 F.3d 238, 246 (4th Cir. 2015) (quoting *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011)). The relevant facts provided by the police officer must "in their totality serve to eliminate a substantial portion of innocent travelers." *Williams*, 808 F.3d at 246 (quoting *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008)).

Reasonable suspicion only gives the officer authority to extend a traffic stop; more is required to search the stopped vehicle. An officer may only search the vehicle if "he obtains consent, secures a warrant, or develops probable cause to believe the vehicle contains evidence of criminal activity." *Palmer*, 820 F.3d at 650 (citing *United States v. Baker*, 71 F.3d 313, 319 (4th Cir. 2013)). Under the automobile exception to the search warrant requirement, police may search a car that is "readily mobile" without a warrant if they have probable cause to believe the car contains some contraband. *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)); *see e.g. United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002) (finding the officer had probable cause to search the passenger compartment because he smelled marijuana as he approached the car). Probable cause exists "when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *United States v. Davis*, 997 F.3d 191, 201 (4th Cir. 2021) (quoting *United States v. Patiutka*, 804 F.3d 684, 690 (4th Cir. 2015)). The "principal components" of a court's review and determination of whether probable cause existed "will be the events which occurred leading up to the stop or search" and "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,

3

amount to…probable cause." *Id.* (quoting *United States v. Brookins*, 345 F.3d 231, 235-36 (4th Cir. 2003)).

Because the scope of a search under the automobile exception "is as broad as a magistrate could authorize," police may search the entire vehicle and its contents that may conceal the object of the search once they have probable cause. *Kelly*, 592 F.3d at 590 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

## II.     FACTS AND PROCEDURAL HISTORY

At approximately 8:00 pm on March 15, 2023, Officers Matthew Epolito and Jason Buzard of the Charlotte Mecklenburg Police Department saw Mr. Carmichael's vehicle pass their own. Officer Epolito, who was in the driver's seat, noticed that the vehicle windows appeared unlawfully tinted. The officers activated their body worn cameras ("BWC") and siren to initiate the traffic stop. Epolito BWC (8:02:33).[1] Judging from the BWC footage and the officers' testimony, Mr. Carmichael pulled over approximately 30 seconds later, long enough that the BWC footage recorded the two officers commenting on the delay. *Id.* (8:02:50, 8:02:57). Just before the vehicles stopped, Officer Buzard said "that's a lot of moving." Buzard BWC (8:02:55).

Once Mr. Carmichael pulled over on the side of the road, the officers exited their vehicle. Officer Epolito walked to Mr. Carmichael's driver's side and informed Mr. Carmichael that "it looked like the window tint was too dark on the car when you went by, so I just want to test the tint, not a huge deal." Epolito BWC (8:03:27). Officer Buzard then alerted Officer Epolito that there was "possibly" an open container in the back seat of the vehicle. Buzard BWC (8:03:34-35).

---

[1] To create a clear timeline, the Court uses the timestamp in the BWC footage for each officer rather than the relative time of the video that has elapsed. Further, the BWC footage provided to the Court appears to be mislabeled. Exhibit B-1 appears to be the BWC footage for Officer Epolito, rather than Officer Buzard. The latter's BWC footage appears to be Exhibit B-2.

4

Officer Epolito then asked Mr. Carmichael "hey man, let me ask you this, have you been drinking at all?" Epolito BWC (8:04:00). When he said "no," Officer Epolito said there appeared to be an open bottle of tequila on the back seat. *Id.* (8:04:07). However, as Mr. Carmichael continued to deny drinking, Officer Epolito said that he did not look intoxicated. *Id.* (8:04:12). Officer Epolito then asked Mr. Carmichael to step out of the car. *Id.* (8:04:15). Mr. Carmichael declined to exit the vehicle, leading the officers to remove him from the car and subdue him once he tried to pull away from them. *Id.* (8:04:45-8:06:22). While the officers were putting Mr. Carmichael in handcuffs, Officer Epolito noted that he had appeared "super nervous" in the car. Buzard BWC (8:05:15). Mr. Carmichael was placed under arrest and, after a pat down, was put in the back of the patrol vehicle. Epolito BWC (8:08:17).

Officer Buzard then went to search Mr. Carmichael's vehicle. Buzard BWC (8:08:27). He checked the back seat, and verbally noted that he found "an open bottle of tequila." *Id.* (8:08:37). Next, Officer Buzard patted down the driver's side seat and then shone his flashlight between the center console and the seat. *Id.* (8:08:34-50). He then reached over and saw a firearm, which he retrieved. *Id.* (8:08:34-53). The officers proceeded to bag the weapon. *Id.* (8:10:00). Officer Buzard returned to the vehicle to conduct a more thorough search and removed the bottle of tequila. *Id.* (8:11:47). The bottle appeared approximately one-third-to-half-full of a yellow liquid. *Id.* The bottle itself was clear with a large cursive "D" on the front and an ornate gold-colored stopper. *Id.* The other writing on the bottle is not clear enough to be read from the BWC footage. *Id.*

After finishing his search of the passenger compartment, Officer Buzard picked up the liquor bottle from the hood of the patrol vehicle, where he had placed it after removing it from the car, and stepped away to pour it out. *Id.* (8:12:46). At the suppression hearing, he testified that the liquid had a strong odor of alcohol when he emptied it and one of the officers noted that they were

5

required to empty the bottle because the evidence collection team would not store a bottle with liquid still inside it. Officer Epolito then tested the passenger side window of Mr. Carmichael's car. *Id.* (8:13:51).[2] He found that the window let only 16% of light pass through. *Id.* (8:13:56).

Soon thereafter, the officers left the scene. Officer Buzard drove Mr. Carmichael's vehicle while Officer Epolito drove the patrol vehicle. They drove the vehicles to a gas station nearby. Buzard BWC (8:23:58). Officer Buzard ensured the vehicle was locked before he got back into the patrol car. (8:24:33-8:25:07). Ultimately, the officers returned to the police station and Officer Buzard Mirandized Mr. Carmichael before questioning him. Mr. Carmichael said that his friend had given him the gun and he did not know it was stolen. *See* Doc. No. 14 at ⁋ 10.

Mr. Carmichael was indicted in September 2023 on one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. 922(g)(1). *See* Doc. No. 1. He filed this motion in May 2024 and the Court held a suppression hearing on June 25, 2024. The motion is now ripe for the Court's review.

## III.  DISCUSSION

Mr. Carmichael argues that the police officers (1) lacked reasonable suspicion sufficient to conduct the traffic stop and (2) had no probable cause to search the vehicle. *See* Doc. No. 14.

### A.  Reasonable Suspicion

#### 1.  The Initial Stop

The Court first finds that the officers had reasonable suspicion to conduct the traffic stop. As noted above, a failure to comply with traffic laws permits police to conduct a traffic stop while officers investigate the suspected violation. *Palmer*, 820 F.3d at 649. Specifically, a reasonable

---

[2] At the suppression hearing, Officer Epolito testified that he checked this window because it is the window he saw as Mr. Carmichael passed the patrol vehicle.

belief that a vehicle has "illegally tinted windows [is] alone 'sufficient to justify' a traffic stop."

*Id.* at 650 (citing *Green*, 750 F.3d at 279 n.1). The Court must "give due weight to common sense

judgments reached by officers in light of their experience and training." *United States v. Mason*,

628 F.3d 123, 128 (4th Cir. 2010) (quoting *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir.

2004)).

The traffic stop occurred at approximately 8:00 pm on March 15, 2023. Mr. Carmichael

argues that because "it was dusk at best" the officers could not have reasonably judged whether

the windows were unlawfully dark. *See* Doc. No. 14. At the suppression hearing, Officer Epolito

testified that in his twelve years as a police officer he has conducted over 300 stops for unlawful

window tints. He has conducted these stops both during the day and at night. He further stated that

there has only been one occasion in which his initial belief that the windows were unlawfully tinted

turned out to be incorrect because he generally only pulls over vehicles with windows that he

believes are clearly too dark. *See Palmer*, 820 F.3d at 651 ("Palmer asserts that Ring lacked any

objectively reasonable grounds for stopping the Nissan. That contention is meritless. Ring was

familiar with the limits on window tint under Virginia law and, in his view, the Nissan's windows

were too dark."). In short, Officer Epolito testified that he had extensive experience identifying

unlawfully tinted windows and the Court is satisfied that he "was accustomed to making such

observations at night." *State v. Doughty*, 879 S.E.2d 593 (Table) (N.C. Ct. App. 2022).[3]

---

[3] A window tint test conducted at the scene revealed the windows allowed only 16% of light to pass through, well under the 35% limit in North Carolina. N.C. Gen. Stat. § 20-127(b)(1). This information further corroborates Officer Epolito's testimony that he is experienced at identifying unlawfully tinted windows, even at night. *United States v. Jones*, 500 F. App'x 216, 218 (4th Cir. 2012) (noting that no evidence in "the record demonstrate[s] any reason to doubt either officers' ability to estimate window tint with a reasonable degree of accuracy.").

7

Further, the close proximity of the vehicles allowed Officer Epolito to make his assessment. He noticed Mr. Carmichael's windows when the Defendant passed the patrol vehicle, meaning that Officer Epolito viewed the windows from an advantageous ninety-degree angle rather than from a different angle (which he testified makes it harder to determine whether a window is tinted) and was only a few feet away from the vehicle when he saw the windows. "[L]ikewise, the detaining officers' visual estimate that [Mr. Carmichael]'s windows were illegally tinted was corroborated by a second officer." *United States v. Jones*, 500 F. App'x 216, 218 (4th Cir. 2012). Officer Buzard, who was sitting in the passenger seat, testified that he had difficulty seeing inside the vehicle once it was stopped despite shining his flashlight on the window. Considering the testimony given at the hearing, and the Court's own review of the BWC footage, the Court finds that the officers had reasonable suspicion to stop Mr. Carmichael's vehicle.

## 2. Extending the Stop

Next, the Court also finds that the officers had the necessary "reasonable, articulable suspicion of ongoing criminal activity" to extend the traffic stop beyond the scope of the initial justification. *Palmer*, 820 F.3d at 649-50 (quoting *Digiovanni*, 650 F.3d at 507)). As he approached the car, Officer Epolito notified Mr. Carmichael that he intended to check the tint on the windows. However, after being alerted by Officer Buzard that there was what looked to be a partially consumed liquor bottle in the back seat of the car, Officer Epolito asked Mr. Carmichael whether he had been drinking. In North Carolina, it is unlawful to possess an open container of an alcohol beverage or to consume alcohol while driving. N.C. Gen. Stat. § 20-138.7(a1). Both officers testified that Mr. Carmichael was not slurring his words, nor did he appear visibly intoxicated. The officers did, however, note that the bottle was standing upright in the backseat, which they believed was unusual given that the vehicle had been moving.

8

Further, Officer Epolito testified that Mr. Carmichael's behavior raised safety concerns. Specifically, he explained that Mr. Carmichael had taken significantly longer to pull over than most drivers do, was shifting his body (known as blading), leaning forward as though he was concealing something, and on the BWC footage he told Officer Buzard that Mr. Carmichael had been "super nervous" when they first spoke. Officer Buzard testified that he saw "a lot of moving" while the officers waited for Mr. Carmichael to pull over, which, based on his training and experience, often means the vehicle's occupant is attempting to hide or conceal an object. The Court concludes that, based on the partially consumed liquor bottle and Mr. Carmichael's "demeanor and behavior throughout the traffic stop" that the officers "did not act unreasonably or unnecessarily prolong" the stop based on these facts. *Green*, 740 F.3d at 281; *see also United States v. Mitchell*, 3:23-CR-39, 2023 WL 4765582, at *8 (E.D. Va. July 26, 2023) (finding officers had reasonable suspicion that criminal activity was afoot because officers spotted an open bottle of alcohol, the defendant was making furtive movements, and defendant was trying to hide the right side of his body).

The Court, therefore, finds that both prongs of the *Terry* standard were satisfied and that the police had adequate reasonable suspicion to conduct the stop and subsequently to prolong it.

### B.      Probable Cause to Search the Vehicle

Mr. Carmichael also contends that officers lacked probable cause to search his vehicle. The automobile exception to the warrant requirement recognizes vehicles' "inherent mobility and the risk that contraband inside the vehicle could disappear while officers obtain a search warrant." *United States v. Johnson*, 689 F. App'x 214, 215 (4th Cir. 2017) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)). If it applies, the "scope of the search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.'" *Id.* (quoting

*United States v. Ross*, 456 U.S. 798, 824 (1982)). The Court concludes, based on the totality of the circumstances, that Officers Epolito and Buzard had probable cause to search the vehicle.

Both officers observed what appeared to be a partially empty, open bottle of tequila in plain view in the back seat of the passenger compartment. Officer Buzard testified that the bottle, which appeared just under half-empty on the BWC footage,[4] had a strong odor of alcohol as he poured out the yellow liquid inside it. Officer Epolito testified that it is uncommon, in his experience, for people to drink directly from a liquor bottle and so the officers sought to search the car to look for evidence of other containers that would suggest Mr. Carmichael was drinking. *See United States v. Nash*, 100 A.3d 157, 164 (D.C. Cir. 2014) (upholding the search of the car for evidence of possession of an open container of alcohol after crediting officers' testimony that based on their experience, "people usually use cups to drink tequila and similar types of hard alcohol, rather than drinking straight out of the bottle.").

The bottle, combined with the officers' observations of Mr. Carmichael's behavior, including his nervous behavior, agitation, and Officer Buzard's statement on the BWC footage that he saw "a lot of moving" when the officers waited for Mr. Carmichael to pull over created "probable cause to retrieve the [tequila] bottle and search the vehicle for evidence of a violation of [N.C. Gen. Stat. Ann. § 20-138.7(a1)], which prohibits the consumption of" an alcoholic beverage while driving. *Johnson*, 689 F. App'x at 216. The Court further notes that the search was not overly intrusive. Officer Buzard stated that he generally searches under seats, between seats, or in glove box compartments because that is where smaller containers are often found. Here, the weapon was

---

[4] Mr. Carmichael contends there was no information from the officers as to how they knew the bottle was open. However, the BWC footage clearly establishes that the bottle was at most half full. The Court finds that a reasonable officer would have probable cause to believe the seal was broken under these circumstances.

located between the driver's seat and the center console. Accordingly, the Court find that the officers had probable cause to conduct a warrantless search of the vehicle pursuant to the automobile exception. As a result, the Court need not address Mr. Carmichael's argument that the search incident to arrest exception was inapplicable.

In summary, the Court finds that the officers had reasonable suspicion to conduct the initial traffic stop and then to prolong it. The Court also finds that the officers were permitted to conduct a warrantless search of the vehicle pursuant to the automobile exception. The Court will therefore deny the Motion to Suppress.[5]

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendant's Motion to Suppress (Doc. No. 13) is **DENIED.**

**SO ORDERED.**

Signed: July 1, 2024

Kenneth D. Bell
United States District Judge

---

[5] Mr. Carmichael also asks the Court to suppress any statements he made. *See* Doc. No. 14. However, Mr. Carmichael does not identify which statements he seeks to suppress. If it is his statement admitting possession of the firearm, the Court notes that Mr. Carmichael had received his *Miranda* warnings at the time of his statement and has not argued that his statement was involuntary.